**F I L E D**

**PUBLISH**

**February 9, 2006**

**UNITED STATES COURT OF APPEALS**

**Elisabeth A. Shumaker**
**Clerk of Court**

**TENTH CIRCUIT**

---

CONNIE ROSKA, on behalf of minor
children Rusty and Jessica Roska, and
Maria Stewart; JAMES ROSKA, on
behalf of minor children Rusty and
Jessica Roska, and Maria Stewart,

    Plaintiffs-Appellees,

v.

MELINDA SNEDDON; SHIRLEY
MORRISON; COLLEEN LASATER,

    Defendants-Appellants.

No. 04-4086

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 1:99-CV-112-DAK)**

---

Debra J. Moore, Office of the Utah Attorney General, Litigation Division (Mark
L. Shurtleff, Utah Attorney General, Nancy L. Kemp, Peggy E. Stone, Peter L.
Rognlie, Assistant Utah Attorneys General, on the briefs), Salt Lake City, Utah,
for Defendants-Appellants.

Steven C. Russell, Affordable Legal Advocates, P.C., Salt Lake City, Utah, for
Plaintiffs-Appellees.

---

Before **SEYMOUR**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.  Introduction

Plaintiffs-Appellees Connie and James Roska brought suit under 42 U.S.C. § 1983 against Defendants-Appellants Melanie Sneddon, Shirley Morrison, and Colleen Lasater.  Plaintiffs allege that Defendants' removal of their son, Rusty Roska, from their home without a warrant or pre-deprivation hearing violated their Fourth and Fourteenth Amendment rights.  The district court initially granted Defendants' motion for summary judgment on qualified immunity.  This court reversed in part, holding that Plaintiffs had sufficiently alleged a violation of their clearly established constitutional right to maintain a family relationship. The case was remanded to the district court to consider whether Defendants' reliance on Utah Code Ann. §§ 62A-4a-202.1 and -202.2 or the advice of counsel made their conduct nonetheless objectively reasonable and thus entitled them to qualified immunity.  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1253–54 (10th Cir. 2003) [hereinafter *Roska I*].  On remand, the district court denied Defendants' motion for summary judgment on qualified immunity and granted Plaintiffs' motion for summary judgment on liability.  Defendants appealed.  This court has jurisdiction pursuant to 28 U.S.C. § 1291 and *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  Because Defendants failed to comply with the statute on

which they base their qualified immunity claim, Defendants' conduct was not objectively reasonable. Thus, we **affirm**.

## II. Background

On May 26, 1999, Davis County School District employees met with Melinda Sneddon, a caseworker for the Utah Department of Child and Family Services ("DCFS"), to discuss allegations of possible medical neglect of twelve-year-old Rusty Roska. School employees noted Rusty's declining health and expressed concern that Rusty might die if DCFS did not intervene. They informed Sneddon that when Connie Roska, Rusty's mother, dropped him off at school the week before, he looked ill and pale, was sweating profusely, and was wearing a parka in seventy-degree weather. When a school nurse asked Mrs. Roska about Rusty's health, Mrs. Roska stated that Rusty was suffering from kidney failure. Concerned, the nurse called Rusty's main treating physician, Dr. Judith Gooch, who assured her Rusty was not in kidney failure. School employees also informed Sneddon of occasions when Mrs. Roska told school employees Rusty had parasites in his intestines, a hole in his esophagus, and a disease that afflicts only a few people worldwide. Additionally, Sneddon was told that Rusty's healthy appendix had been removed at Mrs. Roska's insistence.[1]

---

[1]Although Mrs. Roska disputes many of the statements attributed to her by school employees, the dispute is irrelevant in this case. The issue we must decide
(continued...)

Sneddon assigned Shirley Morrison, another DCFS caseworker, to investigate Rusty's case. Morrison reviewed Rusty's records, including information on an April 1998 DCFS investigation into allegations that Mrs. Roska suffered from Munchausen Syndrome by Proxy ("MSBP"). MSBP is a disorder in which an individual, usually a mother, inflicts physical harm upon a child to gain the sympathy and attention of medical personnel. John B. Murray, *Munchausen Syndrome/Munchausen Syndrome by Proxy*, 131 J. Psychol. 343, 343–44, 346–47 (1997). The prior DCFS investigation concluded that the allegations of MSBP were unsubstantiated.

Morrison also contacted several of Rusty's physicians, including Dr. Brian Evans and Dr. Michael Joseph. When Morrison informed the physicians she was investigating Mrs. Roska for MSBP, both stated something to the effect that it was about time someone discovered what was going on with Rusty. Additionally, Dr. Evans informed Morrison of a 1998 investigation by Primary Children's Medical Center in Salt Lake City that was unable to confirm MSBP. Dr. Joseph, who treated Rusty at the UCLA Children's Hospital Pain Clinic in November 1998, stated that he had developed a treatment plan for Rusty when he left the

---

[1](...continued)
is whether Defendants' actions were objectively reasonable in light of the information they possessed at the time of removal, regardless of whether the information was accurate or not. Plaintiffs do not dispute that school employees told Defendants Mrs. Roska made these statements.

Clinic, but that after initial compliance, Mr. and Mrs. Roska failed to follow through. Morrison attempted to contact Dr. Judith Gooch, Rusty's main treating physician, but was unable to reach her. The next day, Dr. Gooch either spoke to Morrison or left her a voice mail message stating that Rusty's case was complicated and she would prefer they make an appointment to discuss the case in-person. Dr. Gooch had not been told there was an emergency or that removal of Rusty was being considered.

Morrison also spoke to Dr. Brenda Bursch, an expert in MSBP who treated Rusty at the UCLA Pain Clinic. Dr. Bursch informed Morrison that she had suspected MSBP, but could not document any behavior that lead to the conclusion that MSBP was being committed after careful observation of the family at UCLA. That same day, Morrison and Sneddon met with Craig Peterson, an Assistant Attorney General of Utah, to discuss Rusty's case. Peterson informed them that the information Morrison had gathered was legally sufficient to support removal of Rusty from his home without a warrant. Thereafter, although Morrison did not believe Rusty was in imminent danger of death, Morrison, Sneddon, and a police officer went to the Roskas' home to remove Rusty. While they were at the home, Dr. Gooch spoke to Sneddon on the telephone. Sneddon stated Dr. Gooch informed her that removing Rusty would inhibit Mrs. Roska's progress in attending appointments, and may destroy "this family emotionally and Rusty may

-5-

never recover." Dr. Gooch testified that she told Sneddon, "it would be harmful, it would be bad for them, it would be bad for Rusty, bad for his family to remove him from the home." Dr. Gooch would neither confirm nor deny MSBP. After speaking with Dr. Gooch, Sneddon called her supervisor, Colleen Lasater, who advised her to continue with the removal. Rusty was taken into protective custody and placed in foster care.

At a shelter hearing six days after the removal, the juvenile court ruled that Rusty should remain in protective custody. The next day, however, the juvenile court received additional evidence at a hearing for a temporary restraining order. At this second hearing, the juvenile court released Rusty to his parents' custody, but ordered extensive DCFS supervision.

Rusty Roska, his parents, and his siblings brought suit under 42 U.S.C. § 1983, alleging various rights deprivations under the Fourth and Fourteenth Amendments as a result of Rusty's removal.[2] The district court granted Defendants' motion for summary judgment on qualified immunity and dismissed the suit. On appeal, this court affirmed in part and reversed in part. *Roska I*, 328 F.3d at 1254. Relevant to this appeal, we determined that Plaintiffs sufficiently alleged a violation of their clearly established constitutional right to maintain a

---

[2] The only remaining parties are Plaintiffs Mr. and Mrs. Roska and Defendants Sneddon, Morrison, and Lasater. All claims by and against other parties have been dismissed.

family relationship. *Id*. at 1245–46, 1250. This court further considered whether Defendants demonstrated their conduct was nonetheless objectively reasonable in light of their reliance on Utah child protection statutes and the advice of counsel. *Id*. at 1251–54. This court rejected the district court's conclusion that Defendants were entitled to qualified immunity based on Utah Code Ann. § 78-3a-301 because that statute does not authorize removal without pre-deprivation procedures. *Id*. at 1252. We remanded the case, however, for the district court to consider whether Defendants' reliance on Utah Code Ann. §§ 62A-41-202.1 and -202.2, which provide for removal without a warrant or pre-deprivation hearing, or reliance on the advice of counsel rendered Defendants' conduct objectively reasonable such that they are entitled to qualified immunity. *Id*. at 1253–54.

On remand, the district court entertained cross-motions for summary judgment. The district court concluded Defendants were not entitled to qualified immunity as to the claims asserted by Mr. and Mrs. Roska because their conduct was not objectively reasonable. *Roska v. Sneddon*, 311 F. Supp. 2d 1307, 1316–17 (D. Utah 2004). Specifically, the district court concluded that while Defendants did rely on Utah Code Ann. §§ 62A-4a-202.1 and -202.2, they did not actually comply with the statute and could not reasonably have concluded that their noncompliance was constitutional. *Id.* at 1313–16. Moreover, the district court reasoned Defendants were not entitled to rely on the advice of counsel

because Peterson did not know of Dr. Gooch's opposition to removal when he advised Defendants that removal was proper. *Id*. at 1316–17. The district court thus denied Defendants' motion for summary judgment on qualified immunity and granted Plaintiffs' motion for summary judgment on liability. *Id*. at 1318.

Defendants do not contest the district court's conclusion that they are not entitled to qualified immunity based on their reliance on the advice of counsel. Therefore, we do not address this issue on appeal.

## III. Discussion

### A. Local Rule

As a preliminary matter, Defendants claim the district court erred in granting Plaintiffs' motion for summary judgment because Plaintiffs failed to comply with local rule D. Utah Civ. R. 56-1(b). D. Utah Civ. R. 56-1(b) provides that a memorandum in support of a motion for summary judgment "must . . . contain[] a concise statement of material facts as to which movant contends no genuine issue exists." Moreover, "[t]he facts must be numbered and refer with particularity to those portions of the record on which movant relies." D. Utah Civ. R. 56-1(b). Because we lack appellate jurisdiction over the district court's grant of summary judgment to Plaintiffs, we do not address Defendants' argument.

Under 28 U.S.C. § 1291, this court only has appellate jurisdiction over "final decisions" of district courts. This finality requirement "precludes consideration of decisions that are subject to revision, and even of fully consummated decisions [that] are but steps towards final judgment in which they will merge." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (quotation omitted). Nevertheless, under the "collateral order" doctrine, some district court orders are considered "final" even though they are entered before a case has been fully resolved. *See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145–46 (1993) (Eleventh Amendment immunity); *Mitchell*, 472 U.S. at 530 (denial of qualified immunity); *Abney v. United States*, 431 U.S. 651, 662 (1977) (double jeopardy). The collateral order doctrine, however, does not apply to Defendants' assertion that Plaintiffs failed to comply with a local rule. Plaintiffs moved for summary judgment on the issue of liability.[3] Although the district court granted the motion, the issue of causation and damages is still to be

---

[3]After Defendants filed a motion for summary judgment on qualified immunity, Plaintiffs filed a cross-motion asking for summary judgment based solely on their position that Defendants were not entitled to qualified immunity. The district court granted Plaintiffs' motion, in part, without explicitly addressing the merits of Plaintiffs' claims. *Roska v. Sneddon*, 311 F. Supp. 2d 1307, 1318 (D. Utah 2004). Because this court previously held Defendants violated Plaintiffs' clearly established constitutional right, however, the effect of the district court's subsequent conclusion that there were no genuine issues of material fact and Defendants were not entitled to qualified immunity was a grant of summary judgment to Plaintiffs on liability.

decided. "[A]n order that determines liability but leaves damages to be calculated is not final," unless the calculation of damages is merely ministerial. *Albright v. UNUM Life Ins. Co.*, 59 F.3d 1089, 1092–93 (10th Cir. 1995) (quotation omitted). Because further proceedings are necessary to determine causation and the amount of damages, if any, the district court's order is not final and the grant of Plaintiffs' motion is not immediately appealable.

Nevertheless, this court has discretion to exercise pendent appellate jurisdiction over nonappealable issues once we have asserted jurisdiction over other appealable issues in the same case. *Garrett v. Stratman*, 254 F.3d 946, 953 n.9 (10th Cir. 2001). It is appropriate to exercise pendent appellate jurisdiction "where the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one." *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995) (quotations omitted). A nonappealable decision is inextricably intertwined with an appealable one if resolution of the appealable decision necessarily resolves the nonappealable issue as well. *Id.* The exercise of pendent jurisdiction, however, "is generally disfavored." *Id.* at 929.

Although we have jurisdiction over Defendants' appeal from the district court's denial of their motion for summary judgment on qualified immunity, we

decline to assert pendent appellate jurisdiction over Defendants' claim that the district court failed to apply a local rule. The two issues are not inextricably intertwined and it is not necessary for us to reach Defendants' local-rule argument or even the underlying grant of summary judgment to Plaintiffs to fully examine the appropriateness of the district court's denial of qualified immunity.

**B. Reliance on Statute**

Defendants claim the district court erred in denying their motion for summary judgment on qualified immunity because Defendants' reliance on Utah Code Ann. §§ 62A-4a-202.1 and -202.2 made their conduct objectively reasonable. A denial of qualified immunity is immediately appealable if the district court's decision turns on an issue of law. *Mitchell*, 472 U.S. at 530. When there are no relevant historical facts in dispute, the objective reasonableness of an official's actions is a legal question. *Roska I*, 328 F.3d at 1251. Here, the district court determined no relevant material facts are in dispute, and the parties do not contest this conclusion. Thus, the district court's denial of summary judgment is properly before this court on interlocutory appeal. We review a district court's denial of summary judgment based on qualified immunity *de novo*. *Perez v. Ellington*, 421 F.3d 1128, 1131 (10th Cir. 2005).

When a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show the defendant is not entitled to immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). To overcome a qualified immunity defense, a plaintiff must first establish a violation of a constitutional or statutory right and then show that the right was clearly established. *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996). Plaintiffs have already met this burden. In *Roska I*, this court held that Defendants' removal of Rusty without a warrant or

-12-

pre-deprivation hearing deprived Plaintiffs of their clearly established constitutional right to maintain a family relationship. 328 F.3d at 1245–46, 1250.

Usually, if the law is clearly established at the time of defendant's conduct, a qualified immunity defense will fail. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982). "Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Id*. at 819. Reliance on a state statute is one extraordinary circumstance which may render an official's conduct objectively reasonable. *Roska I*, 328 F.3d at 1251–52. Reliance on a statute does not, however, make an official's conduct *per se* reasonable. *Id*. at 1252. Rather, it is one factor "which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." *Id*. (quotation omitted). Relevant factors in determining whether reliance on a statute rendered an official's conduct objectively reasonable include: (1) the degree of specificity with which the statute authorized the conduct; (2) whether the official in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the official could have reasonably concluded the statute was constitutional. *Id*. at 1253. Defendants bear the burden of proving their conduct was objectively reasonable in light of a state statute. *Id*. at 1251.

Utah Code Ann. § 62A-4a-202.1 (1998)[4] authorized DCFS to take a child into protective custody without obtaining a warrant if: (1) a caseworker had substantial cause to believe any of the factors in Utah Code Ann. § 78-3a-301 existed, and (2) the caseworker provided the child's parents or child with services that would eliminate the need for removal, if those services were reasonably available and consistent with the child's safety and welfare. Utah Code Ann. § 62A-4a-202.2 provided for post-deprivation procedures that had to be in place before DCFS could remove a child without a warrant pursuant to Utah Code Ann. § 62A-4a-202.1. The parties agree that these statutory provisions had not fallen into desuetude at the time of Defendants' actions.

Further, Defendants could have reasonably concluded the statute was constitutional. When a legislature has enacted a statute, officials "are ordinarily entitled to rely on the assumption that the [legislature has] considered the views of legal counsel and concluded that the [statute] is a valid and constitutional exercise of authority." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). When a statute authorizes conduct that patently violates the

---

[4] Utah child protection laws were amended after the events that gave rise to this litigation. The amended statute, which took effect in July 2002, requires exigent circumstances before DCFS can remove a child without a warrant. Utah Code Ann. § 62A-4a-202.1(1) (2000 & Supp. 2005). All subsequent references in this opinion to the Utah Code are to the versions of the statutes in effect at the time Rusty was removed.

-14-

Constitution, however, officials are not entitled to turn a blind eye to its obvious unconstitutionality and then claim immunity based on the statute. *Id.*

The statute in this case was not patently unconstitutional. We recognize that there are some governmental interests which, when weighed against a parent's liberty interest in maintaining a family relationship, justify postponing due process. *Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1989). The safety and welfare of children is one such governmental interest. *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999). Although there must be extraordinary circumstances to justify postponing due process, Defendants were entitled to rely on the assumption that the Utah legislature took these requirements into account when drafting the statute. Specifically, the statute required both danger to the child and reasonable efforts to eliminate the need for removal before a child could be placed in protective custody without a warrant. Utah Code Ann. § 62A-4a-202.1. Moreover, the statute required certain post-deprivation procedures to be in place before a child was removed. Utah Code Ann. § 62A-4a-202.2. It was thus reasonable for Defendants to conclude that the statute was a constitutional balancing of the government's interest in protecting children with a parent's constitutional right to maintain a family relationship. *See Malachowski v. City of Keene*, 787 F.2d 704, 714 (1st Cir. 1986) (holding officer could rely on state statute allowing him to

take child into custody when, without immediate action, her welfare would be in danger because officer could have reasonably concluded statute was constitutional). Additionally, the child protection statute that existed at the time of Rusty's removal was enacted in 1994 in response to a federal civil rights lawsuit against DCFS and its constitutionality had not been challenged. Therefore, it was reasonable for Defendants to conclude Utah Code Ann. §§ 62A-4a-202.1 and -202.2 were constitutional.

Nevertheless, Defendants failed to actually comply with the statute on which they rely. Utah Code Ann. § 62A-4a-202.1(2)(b) provided:

> If possible, consistent with the child's safety and welfare, before taking a child into protective custody, the [caseworker] shall also determine whether there are services reasonably available to the worker which, if provided to the minor's parent or to the minor, would eliminate the need to remove the minor . . . . In determining whether services are reasonably available, and in making reasonable efforts to provide those services, the child's health, safety, and welfare shall be the worker's paramount concern.

This provision was not a mere technicality. Rather, it recognized the important statutory "presumption that it is in the best interest and welfare of a child to be raised under the care and supervision of his natural parents." Utah Code Ann. § 62A-4a-201(1). Moreover, it sought to achieve a balancing of the government's

-16-

interest in protecting children with the constitutional "right of parents to conceive and raise their children." *Id.*[5]

Defendants concede they did not provide preventive services to the Roskas. They argue, however, that they complied with the statute because they considered preventive services and determined they were not appropriate. Defendants offer several reasons why their failure to provide services was reasonable.

Defendants first argue that because Rusty's parents failed to follow through with services in the past, specifically the treatment plan developed at the UCLA Pain Clinic, it was reasonable to believe they would not comply in the future. The record, however, is devoid of any indication that DCFS services were offered to the Roskas in the past.[6] Even if the Roskas failed to follow through with the

_____

[5]The requirement of services before removal also recognized that removal can often be just as harmful to children as remaining in the home. *See* Utah Code Ann. § 62A-4a-103(2)(b) (DCFS "shall, when possible and appropriate, provide preventive services and family preservation services in an effort to protect the child from the trauma of separation from his family"). The process of removal itself can cause severe psychological and emotional trauma. Mark R. Brown, *Rescuing Children From Abusive Parents: The Constitutional Value of Pre-Deprivation Process*, 65 Ohio St. L.J. 913, 979–81, 987 (2004). Moreover, after removal, children are placed in temporary shelters or foster care, placements which are notoriously unstable and increasingly subject children to further abuse and neglect. *Id.* at 925; Kay P. Kindred, *Of Child Welfare and Welfare Reform: The Implications For Children When Contradictory Policies Collide*, 9 Wm. & Mary J. Women & L. 413, 460–64, 469–70 (citing a 1986 study that found incidents of abuse and neglect were higher for children in foster care than in the general population).

[6]The dissent argues the Roskas' failure to cooperate with DCFS during a

(continued...)

UCLA treatment plan, it does not necessarily follow that they would therefore reject DCFS services. Although both the UCLA treatment plan and DCFS preventive services are voluntary, failure to comply with DCFS services carries greater consequences because it could result in removal of Rusty from the home and possibly loss of permanent custody. Moreover, Defendants had information from Dr. Gooch that Mrs. Roska was doing a better job of keeping her appointments. This statement undermines Defendants' contention that they reasonably believed Rusty's parents would not comply with DCFS services.

Defendants next argue that because the cause of Rusty's ailments was unknown, it would have been difficult to devise appropriate services. Defendants, however, came to this conclusion without talking to Dr. Gooch, Rusty's main treating physician, about his condition. Further, the treatment plan developed for

---

[6](...continued)
prior investigation into allegations of abuse and neglect made Defendants' belief that the Roskas would not comply with services reasonable. Dissenting Op. at 10. The evidence supporting the contention the Roskas did not cooperate during DCFS's prior investigation, however, is shaky at best. In her Declaration, Sneddon stated, "[i]t was my understanding that Mrs. Roska had not cooperated with DCFS during the prior referral . . . ." Lasater added, "[g]iven . . . the family's prior history with DCFS . . . it would have been impossible for DCFS to provide adequate in-home services . . . ." From these statements, it does not appear that either Sneddon or Lasater participated in the prior investigation, and the source of their conclusory allegations is unclear. In any event, it is not surprising that a parent, when accused of abuse and neglect, whether rightly or wrongly, would be less than fully cooperative with DCFS's investigation. Therefore, the Roskas' failure to cooperate in the investigation, if true, is not an indication that they would not comply with services.

Rusty at the UCLA Pain Clinic had proven effective in the past. Therefore, the record does not support Defendants' argument.

Finally, Defendants claim that allegations of Rusty's parents contributing to or facilitating his illness made it unlikely that preventive services would be successful. They argue that if Mrs. Roska was suffering from MSBP, she may have incentive to prove Rusty really was sick when confronted with allegations that she was causing his illness. Three prior investigations into allegations of MSBP, by DCFS, Primary Children's Medical Center, and Dr. Bursch, however, revealed that the charges could not be substantiated. DCFS therefore should have made services available to prevent the need for immediate removal and then, if the Roskas rejected or failed to comply with them, or if DCFS's further supervision revealed evidence of MSBP, DCFS could have removed Rusty at that time.

In addition to the explanations offered by Defendants, the dissent argues it was reasonable to remove Rusty without providing preventive services because of the serious nature of the alleged abuse. Dissenting Op. at 3–5. The dissent notes that MSBP is "'one of the more dangerous forms of abuse'" with a "'substantial risk of morbidity and even mortality.'" *Id*. at 4, 6. The dissent's suggestion that Rusty's health and safety were in immediate danger because of possible MSBP, however, is belied by our previous opinion in this case. This court previously

held that no emergency circumstances existed to justify removal without due process because "Rusty's health and safety were not in *immediate* danger." *Roska I*, 328 F.3d at 1250 (emphasis added).[7]

---

[7]The dissent misconstrues our reliance on this court's prior determination that Rusty's health and safety were not in *immediate* danger by suggesting that another portion of our prior opinion, in which we determined Defendants had not violated clearly established law under the Fourth Amendment by entering the Roskas' home and seizing Rusty without a warrant, is "equally relevant." Dissenting Op. at 16. In this appeal, the parties do not dispute that Defendants complied with the first prong of Utah Code Ann. § 62A-4a-202.1(2) because they had substantial cause to believe one of the factors in § 78-3a-301 existed. Instead, the issue in dispute is whether circumstances existed such that Defendants' failure to provide preventive services was reasonable pursuant to the second prong of the statute. Although we acknowledge there may be some circumstances in which a child's health and safety are in such immediate danger that preventive services are not appropriate, we have already concluded that immediate danger did not exist in this case. Therefore, Defendants must provide some other reasonable explanation for their failure to provide preventive services.

Moreover, contrary to the dissent's assertion, the portion of our prior opinion discussing the Roskas' Fourth Amendment claim is not relevant to this appeal. In dismissing the Roskas' Fourth Amendment claim, we reasoned that there was some inconsistency in our case law regarding the degree of suspicion necessary for a social worker, as opposed to a police officer, to enter a home and remove a child. *Roska v. Peterson*, 328 F.3d 1230, 1248–1249 (10th Cir. 2003). Nevertheless, we concluded, at the very least, a social worker must have something approaching probable cause to believe a child's health and safety are at risk and the risk is due to the child's presence in the home. *Id*. at 1249–50. Finding support in the record for the district court's determination that Rusty's health and safety were at risk and the risk was likely due to his presence in the home, we affirmed the district court's ruling dismissing the Roskas' Fourth Amendment claim on qualified immunity grounds. *Id*. at 1250. That ruling is not relevant to this appeal, however, because it did not address whether Defendants complied with the second prong of the statute. In fact, at that stage of the proceeding, Defendants were relying on a different statutory provision, Utah Code Ann. § 78-3a-301. *See id*. at 1252. At most, the dissent's citation to our prior

(continued...)

-20-

There may be circumstances in which a child is in such immediate danger that preventive services are not appropriate. The statute allowed for that possibility by stressing that in determining whether services are reasonably available, the child's health, safety, and welfare are of paramount concern. Utah Code Ann. § 62A-4a-202.1(2)(b); *see also* Utah Code Ann. § 62A-4a-202(1)(a). In this case, however, Rusty's health and safety were not in immediate danger. Moreover, Defendants had information from Dr. Gooch suggesting that removal might harm Rusty more than keeping him at home. In light of these circumstances, Defendants' failure to provide the Roskas with preventive services to eliminate the need for removal was not reasonable. Therefore, Defendants did not comply with the statute.

The dissent argues that in concluding Defendants' actions were not reasonable, we have disregarded reports from school employees and the concerns of three other physicians, and instead relied almost exclusively on Dr. Gooch's statement that removal would harm Rusty. Dissenting Op. at 5-6, 11, 12 & n.14. While the statements of Dr. Joseph, Dr. Evans, and Dr. Bursch are relevant to our determination of the reasonableness of Defendants' actions, they are not as compelling as the dissent suggests. Unlike Dr. Gooch, these physicians were not

---

[7](...continued)
opinion supports Defendants' contention that they complied with the first prong of the statute, a contention that is not at issue here.

-21-

in regular contact with Rusty and two of them had not treated Rusty in at least six months.  Moreover, these physicians merely suspected MSBP and their suspicions had not been confirmed after substantial efforts on the part of DCFS, Primary Children's Medical Center, and Dr. Bursch.  In fact, Dr. Bursch, an expert in MSBP, could not document any behavior that led to the conclusion that MSBP was being committed after watching the Roskas very closely during the time they spent at the UCLA Pain Clinic.  Therefore, in addition to contacting these physicians, Defendants should have discussed Rusty's condition and the possibility of preventive services with the person most likely to know about his current health, his main treating physician.[8]  Although Defendants should have talked to Dr. Gooch before they made the decision to remove Rusty, at the very

---

[8]The dissent repeatedly asserts Defendants believed Dr. Evans was Rusty's main physician and thus Defendants' failure to elicit Dr. Gooch's opinion before removal was justified.  Dissenting Op. at 9 n.10, 13, 18.  This contention is not supported by the record.  Although Morrison testified she did not recall when she first learned Dr. Gooch was Rusty's main treating physician, there is evidence in the record to suggest Defendants knew of the important role Dr. Gooch played in Rusty's treatment before they arrived at the Roskas' home to remove Rusty.  The school employees, from whom Defendants received much of their information about Rusty, knew Dr. Gooch was Rusty's main treating physician.  One school official told Defendants when Rusty came to school looking ill and Mrs. Roska reported he was in kidney failure, she called Dr. Gooch to confirm Mrs. Roska's statement.  Additionally, Morrison found a note in Rusty's school records stating, "always talk with Dr. Gooch . . . before taking mother's word for anything."  Dr. Gooch was the first of the listed physicians who Morrison called when she began the investigation.  Finally, before deciding on removal, Morrison "kick[ed] around the fact that [she] hadn't talked to Dr. Gooch."

least they should have done so when they had Dr. Gooch on the telephone at the Roskas' home.[9]

The dissent disregards Dr. Gooch's opinion that removal could harm Rusty based on its unsupported suggestion that Dr. Gooch was being manipulated by Mrs. Roska. Dissenting Op. at 11-12. The dissent notes that the "objective [of a parent with MSBP] is to retain a doctor that will buy-in to the facade." *Id*. at 12. Because Dr. Gooch disagreed with removal, the dissent suggests she must have "bought into" Mrs. Roska's facade. The dissent's approach of discounting the opinion of any doctor who does not support removal when MSBP is alleged, however, would render removal *per se* reasonable in all case involving allegations of MSBP. DCFS could use its suspicions of MSBP, even unsubstantiated ones as in this case, to ignore the opinion of any doctor who believed removal may harm the child and instead rely only on the opinions of doctors who support DCFS's decision to remove. Such a rule would result in increased violations of parental

---

[9]Alternatively, because the allegations of MSBP were unsubstantiated and Defendants had not yet talked to Rusty's main treating physician, Defendants could have sought approval of their decision to remove Rusty without providing services from an impartial judge. Defendants met with attorney Craig Peterson at eleven o'clock in the morning on the day of removal to discuss whether they had sufficient information to justify removal. After this meeting, Defendants had ample time to seek an *ex parte* order permitting removal before court closed for the weekend.

rights and, more importantly, increased harm to children from the psychological and emotional trauma of removal in cases where it is unnecessary.

The dissent appears to discredit the relevance of Dr. Gooch's opinion because it was rendered only after Mrs. Roska was told Rusty would be removed from the home. *Id.* at 11, 17. The responsibility for the timing of Dr. Gooch's opinion, however, rests squarely on the shoulders of Defendants. Although it is unclear whether Morrison spoke to Dr. Gooch or merely exchanged voice mail messages before deciding on removal,[10] at no time prior to arriving at the Roskas' home did Morrison indicate to Dr. Gooch that there was an emergency or that removal of Rusty was under consideration. Thinking she would be able to sit down with Morrison in a week at their scheduled appointment to fully discuss Rusty's condition and treatment, Dr. Gooch had no reason to express her concerns regarding removal because she had no idea removal was a possibility. Because

---

[10]Dr. Gooch's testimony suggests she actually spoke with Morrison. Dr. Gooch stated: "Somebody—I can't remember who called me. I don't know if it was Shirley Morrison had called me before and talked about—we had talked about meeting. There was no sense of urgency, though, to me with that discussion." Morrison's testimony, however, is contradictory. Morrison stated in her deposition that she called Dr. Gooch's office and Dr. Gooch "told me curtly that she did not have the time to talk to me at the moment, that it was a complicated case, and that I needed to make an appointment to see her." At the juvenile court shelter hearing, however, Morrison testified that she received "a message on my answering machine, my voice mail, from Dr. Gooch stating that the case was so complicated that she would prefer that I make an appointment to speak with her."

-24-

Morrison failed to elicit the opinion of Rusty's main treating physician when she first called her on the telephone, Defendants cannot rely on the timing of Dr. Gooch's opinion to justify their actions.

Defendants also argue that the shelter hearing ruling shows their actions were in compliance with the statute and reasonable. At the shelter hearing, the juvenile court found that an emergency situation existed at the time of removal and concluded that DCFS's failure to provide preventive services was thus reasonable. The juvenile court proceeding, however, does not inform our reasonableness analysis for two compelling reasons. First, the juvenile court noted in its ruling from the bench that it relied on Utah Code Ann. § 78-3a-306(14), which allows a judge to order continued removal of a child regardless of any error in the initial removal or a party's failure to comply with the procedural provisions of Utah child protection statutes. Second, the juvenile court did not consider any evidence at the shelter hearing regarding Dr. Gooch's opinion that removal could harm Rusty. Rusty's parents submitted a letter from Dr. Gooch explaining her opinion, but the judge did not consider it because it was not a sworn statement. Moreover, although Morrison testified at the shelter hearing, she failed to mention the telephone call from Dr. Gooch that Sneddon received

before removing Rusty.[11]  The next day at a hearing on a motion for a temporary restraining order, the juvenile court received a sworn affidavit from Dr. Gooch explaining her opposition to removal.  After considering this evidence, the juvenile court returned Rusty to his parents' custody with DCFS supervision. Because the juvenile court did not consider all the information at the shelter

---

[11]The dissent suggests the majority wrongly chastises Morrison for not mentioning the conversation with Dr. Gooch during removal because "Morrison was not asked about the telephone call during either direct or cross examination." Dissenting Op. at 19 n.17.  During the shelter hearing, however, Morrison spoke extensively about each of her other contacts with Dr. Gooch.  Morrison stated,

> I did receive on the 28th a telephone call from Dr.–a message on my answering machine, my voice mail, from Dr. Gooch stating that the case was so complicated that she would prefer that I make an appointment to speak with her.  I tried to make an appointment to speak with her before this hearing, however, she was completely booked up until Monday.  I do have an appointment to speak with her on Monday at noon, however, she did call me recently and tell me that there was no need for that, that she had written a letter on behalf of the Roskas for court today.

Thus, we think it is quite surprising that Morrison did not mention the telephone call in which Dr. Gooch warned against removal.

A juvenile court shelter hearing is not an exercise in gamesmanship in which each party strives to divulge the least amount of information within the confines of the questions asked by counsel.  The purpose of a shelter hearing is to determine what placement is in the best interest of the child.  *See* Utah Code Ann. § 78-3a-306.  Any information regarding the child's health and safety, including a statement from the child's main treating physician that removal may harm the child, is relevant and should be brought to the attention of the court, especially by a social worker tasked with protecting and promoting the best interest of the child.

hearing that Defendants had when they removed Rusty, the juvenile court's ruling

is not dispositive.[12]

---

[12]Although the juvenile court read the unsworn letter from Dr. Gooch at the shelter hearing, the record indicates the court did not consider Dr. Gooch's opinion. The dissent's assertion to the contrary is incorrect. Dissenting Op. at 19–21. After declining to return Rusty to his parents' custody, the juvenile court ordered supervised visits, but agreed to leave the possibility of unsupervised visits open for future discussion. Counsel for the Roskas then stated, "If Dr. Gooch can't convince you that he needs to be home, I don't think there is anything we can do." The court replied, "I've never met or heard or seen Dr. Gooch. I don't know what Dr. Gooch would say." When counsel for the Roskas referred to the letter from Dr. Gooch, the court again stated, "I don't know what, where Dr. Gooch is going to come down on this matter." This exchange indicates the juvenile court did not fully consider the letter from Dr. Gooch in issuing its ruling at the shelter hearing. *Cf. Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."); *Havelock v. United States*, 427 F.2d 987, 991 (10th Cir. 1970) ("[W]hen a case is tried by a court without a jury, it is presumed, absent an affirmative showing to the contrary, that only material and competent evidence is considered.").

At the subsequent hearing on the Roskas' motion for a temporary restraining order, counsel for DCFS argued, as the dissent does, that the Roskas had not presented any additional evidence to alter the court's earlier decision. Dissenting Op. at 21. Counsel stated, "we believe we went through this whole process yesterday and under consideration was Dr. Gooch's letter which, except for maybe some of the legalese which has been changed to irreparable physical and emotional harm and written by the attorney, signed by Dr. Gooch, I think it doesn't, isn't any different than the letter that was taken under consideration yesterday by the Court . . . ." The court, however, disagreed, indicating that the sworn affidavit was different and relying on that affidavit to return Rusty to his parents' custody.

Contrary to the dissent's assertion, this second ruling was precisely an "about-face" based on additional information. Dissenting Op. at 21. At the shelter hearing, the juvenile court did not consider Dr. Gooch's opinion because it was not legally relevant. Upon receiving Dr. Gooch's affidavit at the second hearing, however, the court acknowledged that it now had

(continued...)

-27-

Finally, the dissent notes that after Rusty's removal and return home, he made substantial progress within several months, such that by January 2000, he was walking, attending school, eating, and gaining weight. Dissenting Op. at 8 n.9. Rusty's improvement after removal, however, is not relevant to our determination of whether Defendants' actions were reasonable in light of the information they possessed at the time of removal. In any event, as the dissent acknowledges, Rusty's improvement occurred with substantial supervision and services provided by DCFS. Rusty's progress, at home with DCFS supervision, undermines Defendants' contention that it was reasonable to believe the Roskas would not cooperate with DCFS and services would be difficult to devise and unsuccessful.[13]

---

[12](...continued)
> a sworn statement from a doctor who is treating the child, who is one of the principal people treating the child . . . saying, 'Look, I know this child. I know the child's medical history and I think that we're going to have some, some problems with this child being separated from his parents even if they're not doing a very astute job of caring for the child because the child is fragile and the child has this physical condition that exists in the real world regardless of what causes it. And because the child's emotions play into that, there is a real risk here.

This additional information, which the juvenile court relied on in returning Rusty to his parents' custody, is the very same information Defendants had when they made the decision to remove Rusty.

[13]The dissent attempts to negate the persuasiveness of Rusty's improvement at home with DCFS services by observing that the Roskas' compliance was not voluntary. Dissenting Op. at 8 n.9. In making this point, the dissent seems to

(continued...)

Applying the factors this court articulated in *Roska I*, Defendants could have reasonably concluded Utah Code Ann. §§ 62A-4a-202.1 and -202.2 were constitutional and had not fallen into desuetude. Defendants, however, failed to actually comply with the statute upon which they purportedly relied. While only one of the *Roska I* factors weighs against concluding Defendants' actions were objectively reasonable, it is an important factor and, in this case, it is dispositive. *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005) (denying qualified immunity based on reliance on a statute when official did not comply with statute). What made Defendants' belief in the constitutionality of the statute reasonable was the statute's balancing of the government's interest in protecting children with a parent's constitutional right to maintain a family relationship. Nevertheless, by failing to offer or provide preventive services that were reasonably available when faced with the opinion of the main treating physician that removal might harm Rusty more than allowing him to remain in the home, Defendants failed to properly consider and balance the parents' interest. In light of the balancing required by the statute and the Constitution, this failure was

---

[13](...continued)
overlook the most fundamental dichotomy in this litigation which is the *sine qua non* of the dispute: to remove or not to remove. A decision not to remove premised on involuntary conditions would remain a decision not to remove. Had such a decision been made by DCFS to allow Rusty to remain with his family, this case would have an entirely different complexion and would likely never have been filed.

objectively unreasonable. Defendants are therefore not entitled to qualified immunity.

## IV. Conclusion

For the foregoing reasons, this court **AFFIRMS** the district court's denial of summary judgment to Defendants on qualified immunity and **REMANDS** the matter for further proceedings not inconsistent with this opinion.

04-4086 *Roska v. Sneddon*
**O'BRIEN**, Circuit Judge, dissenting.

The Majority brands Melinda Sneddon, Shirley Morrison and Colleen Lasater ("social workers") as purely incompetent or willful violators of the law.[1] Strong stuff!  Particularly strong because the Majority opinion allows no room for a simple error or a principled difference of opinion.  It necessarily means that any competent social worker in similar circumstances could only arrive at two distinct conclusions: 1) if Rusty was left at home, services <u>adequate to meet his needs</u> would be accepted and could be provided in that environment, and 2) such services were reasonably available.  The Majority says the social workers unreasonably chose removal after learning, in the chaos of the moment, that Rusty's alleged primary care physician believed removal *may* harm Rusty and his family.  In so holding, it necessarily concludes the only reasonable course was for the social workers to disregard reports of Rusty's seriously deteriorating condition and the concerns of three physicians in order to pursue preventive services.  In one respect I agree with the Majority.  The social workers could reasonably believe at all relevant times that Utah Code Ann. §§ 62A-4a-202.1 and 202.2 were current, constitutional and specifically authorized the removal of a child without a warrant.  However, I must respectfully disagree with its conclusion that the social

---

[1]  "We must keep in mind that qualified immunity protects all but the *plainly incompetent*  or those who knowingly violate the law."  *Roska ex rel. Roska v. Peterson (Roska I)*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citing, *Malley v. Briggs,* 475 U.S. 335 (1986)).

workers did not comply with the mandates of § 62A-4a-202.1(2)(b) by failing to

offer preventive services in lieu of removal and therefore are not entitled to

qualified immunity.[2]

The key issue on appeal is whether the social workers in fact complied with

the statute when they did not offer preventive services prior to or in lieu of

removal. Here, the statute requiring preventive services specifically provided:

> (b) If possible, consistent with the child's safety and welfare, before taking a child into protective custody, the worker shall also determine whether there are services *reasonably available* to the worker which, if provided to the minor's parent or to the minor, would eliminate the need to remove the minor from the custody of his parent in accordance with the provisions and limitations of Section 78-3a-301. If those services are *reasonably available*, they shall be utilized. In determining whether services are *reasonably available*, and in making *reasonable efforts* to provide those services, the child's health, safety, and welfare shall be the worker's paramount concern.[3]

---

[2] In *Roska I*, we identified three prerequisites to the warrantless removal of a child from his home pursuant to § 62A-4a-202.1:

(1) the services caseworker must have "substantial cause to believe that any of the factors described in [§] 78-3a-301 exist"; (2) there are no other "services reasonably available . . . which, if provided to the minor's parent or to the minor, would eliminate the need to remove the minor from the custody of his parent"; and (3) the services caseworker must be accompanied by a peace officer, unless one is not reasonably available."

328 F.3d at 1253 n.31 (quoting UTAH CODE ANN. § 62A-4a-202.1 (1998)).

[3] Since Rusty's removal, § 62A-4a-202.1 has been amended several times. In relevant part, it now provides that a child welfare worker may not remove a minor from the minor's home unless the child welfare worker has (1) received the

(continued...)

UTAH CODE ANN. § 62A-4a-202.1(2)(b) (1998) (emphasis added). The term "reasonable" or "reasonably" is used no less than four times. As a result, we must determine whether the social workers' judgement that there were no reasonably available preventive services that would eliminate the need to remove Rusty and secure his health, safety and welfare was a reasonable decision for a competent professional. If so, the social workers are entitled to qualified immunity. As a guide to our inquiry, we must remember the statute required the child's health, safety and welfare to be the deciding factor. In addition, as in all reasonableness determinations, the "touchstone" of our inquiry is the "totality of the circumstances." *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

Thus, a pivotal point in this case is the nature of the suspected abuse facing these professionals. Here, there were reasonable suspicions that Rusty's serious condition was the product of "Munchausen syndrome by proxy (MSBP)," also known as "[f]actitious disorder by proxy" (FDP).[4] Lynne Holland Goldman &

---

[3](...continued)
consent of the minor's parent or guardian, (2) obtained a court order or (3) exigent circumstances exist. UTAH CODE ANN. § 62A-4a-202.1(1)(a), (b). However, at the time of Rusty's removal, the statute did not require exigent circumstances.

[4] FDP is the diagnostic label provided by the Diagnostic and Statistical Manual of Mental Disorders, DSM-IV (APA, 1994). Lynne Holland Goldman & Beatrice Crofts Yorker, *Mommie Dearest? Prosecuting Cases of Munchausen Syndrome by Proxy* , 13-WTR CRIM. JUST. 26, 27 (Winter 1999). Ms. Morrison included a complete report on the syndrome in the case file.

Beatrice Crofts Yorker, *Mommie Dearest? Prosecuting Cases of Munchausen Syndrome by Proxy*,13-WTR CRIM. JUST. 26, 27 (Winter 1999).[5] Commentators identify MSBP by four elements: "(1) a child's illness is induced by a parental figure; (2) a parent repeatedly seeks medical examination and care of the child; (3) the parent denies any knowledge of the progress of the illness; and, (4) the symptoms quickly cease when the child and the parent are formally separated." Susan L. Pollet, *Outside Counsel Column "Munchausen Syndrome By Proxy - A Horror Story Come Real"*, 30 WESTCHESTER B. J. 33, 34 (Spring 2003) (quotations omitted). "Medical professionals become the unwitting puppets of a mother with MSBP . . . ." E. Selene Steelman, *A Question of Revenge: Munchausen Syndrome By Proxy and a Proposed Diminished Capacity Defense for Homicidal Mothers*, 8 CARDOZO WOMEN'S L.J. 261, 269 (2002). The victims are subjected to "unnecessary procedures and tests" as well as "frequent and prolonged hospitalizations that . . . interfere with normal peer relationships and contribute to the child's self-concept as a chronically ill patient." *Id*.; Beatrice Crofts Yorker, *Court Video Surveillance of Munchausen Syndrome By Proxy: The Exigent Circumstances Exception,* 5 HEALTH MATRIX: J. of L. MED. 325, 327 (Summer 1995). "The repetitive, compulsive nature of MSBP and the high

---

[5] Facts regarding MSBP can be found in the record at Appendix Volume II, pages 476-84.

-4-

mortality rate make this one of the more dangerous forms of abuse." Lynne

Holland Goldman & Beatrice Crofts Yorker, *supra,* at 29.

> The authors of Munchausen by Proxy: Child Abuse in the Medical
> System sum up the problems faced by the medical community in
> recognizing this often baffling form of child abuse:
>
>> Munchausen Syndrome by Proxy therefore evolves as a
>> product of the relationship between a parent who has
>> both the capacity for abuse and the potential to be
>> gratified by the medical system and a medical system
>> that is specialized, investigation-oriented, fascinated by
>> rare conditions, often ignorant of abusive behaviors, and
>> too accepting of reported histories.

Suzanne Painter Mochow, *Munchausen Syndrome By Proxy: A Subtle Form of*

*Child Abuse and a Potential Due Process Nightmare*, 18 J. Juv. L. 167, 169

(1997) (quoting Terence Donald, Jon Jureidine & Catherine D. DeAngelis,

*Munchausen Syndrome by Proxy: Child Abuse in the Medical System*, 150

Archives of Pediatric & Adolescent Medicine, July 1996, at 753).

Against this backdrop, we consider the information available to the social

workers when they determined to remove Rusty from his home without first

offering preventive services. Despite the Majority's cavalier treatment of the

school personnel's accounts, there is no question that an urgent concern for

Rusty's welfare motivated the report to DCFS.[6] School personnel, including

---

[6] Patricia Maynor, the school nurse, related the last time she saw Rusty, "[h]e was huddled in 70 degree weather with a heavy winter coat on and was sweating profusely, was very pale and clammy and it looked like he was in a lot

(continued...)

school nurses, informed Ms. Sneddon that Rusty's condition was drastically

deteriorating. That fact, coupled with Mrs. Roska's alarming reports of Rusty's

condition and diseases, led them to believe the Roskas were either facilitating or

improperly addressing Rusty's alleged distress. Indeed, the school employees

were concerned that, in a matter of months, Rusty may die if he remained in his

home. This concern was not misplaced. MSBP is "a form of child abuse with a

substantial risk of morbidity and even mortality." *In re McCabe*, 580 S.E.2d 69,

---

[6](...continued)
of pain." (App. Vol. II at 216.) Mrs. Roska told her Rusty was in kidney failure.
Previously, Mrs. Roska had told Nurse Maynor Rusty had parasites in his liver,
had been in liver failure, and was suffering from intestinal parasites. Nurse
Maynor testified "I had seen a real deterioration in his physical being, his
physical well-being. I was very concerned." (*Id.* at 217.) Cheryl Wilson, Rusty's
sixth grade and home-school teacher stated, "By the end of the school year,
Rusty's condition never improved, he was getting thinner and weaker. I believed
something needed to be done or Rusty was in danger of dying . . . . I was
concerned that Rusty was not getting the medical attention he was in need of."
(*Id.* at 366.) Heather Sather, the coordinator of special services at the school
stated, "I was alarmed at the child's deterioration." (*Id.* at 568.) Ms. Sneddon
testified the school officials

> told me that they had known this family for almost two years and that
> they had been keeping a file . . . . They told me that they felt if DFS
> didn't step in and remove this child from the home that this child
> would never see seventh grade. . . . They were afraid, because they
> were afraid over the summer he would die. . . . They were telling
> me that every day he looked worse and worse, that he looked pale,
> that he was losing weight, he was able to do less and less for himself,
> and they were very concerned for his health and safety.

(*Id.* at 347.)

-6-

73 (N.C. Ct. App. 2003). In addition, the records obtained by DCFS included Wilson's handwritten notes in October 1998, approximately a month prior to his visit to UCLA Children's Hospital Pain Clinic. These records contain notations such as "10/19[/98] . . . Tub of puk[e] or something on bed. Bloody Kleenex's [sic] on s[h]elves." and "10/27 . . . Tub with puk[e] & Kleenexs [sic] still on bed." (App. Vol. II at 373-74.)

The social workers were also aware of two earlier investigations into suspicions of MSBP in 1998, one conducted by Primary Children's Medical Center and one conducted by DCFS based on a former treating physician's report.[7] When informed by Ms. Morrison that MSBP was suspected, both Dr. Joseph, Rusty's physician at UCLA, and Dr. Evans, listed as Rusty's primary physician on his school emergency contact form, expressed their own substantial

---

[7] Dr. Bursch did not do a full-blown investigation of MSBP, but the family was watched carefully while they were at UCLA. While Rusty was treated as an in-patient (a close and structured environment), the family did not exhibit any evidence of MSBP.

concerns.[8]  Further, Ms. Morrison knew that Dr. Bursch, also from UCLA, suspected MSBP.

Dr. Joseph explained that while Rusty was treated as an in-patient at UCLA, he made substantial progress.  Within ten days after Rusty's arrival at UCLA, "Rusty was newly able to stand, walk up to 40 feet, crawl 20 feet, propel his wheelchair around the hospital and surrounding hospital grounds, walk up/down three stairs and get in and out of a very tall bathtub."  (*Id.* at 574.) Rusty's prognosis was near full recovery within "1-4 months" with proper follow-up treatment.[9]  (*Id.*)  However, his rehabilitation program, normally a three-month

_____

[8] As reported in the DCFS investigative files, Dr. Joseph stated, "he has wondered when someone would figure out what is going on.  . . .  [H]e is not sure if [Mother] is actively making [Rusty] sick, but she is surely involved passively. He thinks [Mother] is very 'Munchoid.'  He said [Mother] will take [Rusty] to the doctors but fails to comply with treatment suggestions."  (App. Vol. II at 607.) Dr. Evans "wanted to know who finally realized what was going on and referred this case . . . .  Dr. Evans said he has been concerned for some time . . . .  Dr. Evans feels the parents are not following through with recommended treatment for [Rusty]."  (*Id.* at 608.)

[9] After Rusty's removal and return home, he achieved substantial rehabilitation within a month under constant supervision by DCFS.  By the end of June 1999, Rusty had started trying food and was walking with a walker.  By September 1999, Rusty was walking with a cane, eating on his own, gaining weight and attending school.  By January 2000, Rusty was walking normally, attending school, eating and continuing to gain weight.  Contrary to the Majority's assertion, Rusty's success under DCFS supervision does not undermine the reasonableness of the social workers' decision to forego preventive services prior to removal.  Compliance with DCFS was not voluntary, but ordered by the juvenile court.  Moreover, 20/20 hindsight does not change the analysis.  The social workers' response is required to be reasonable under the circumstances, not

(continued...)

stay, was prematurely discontinued after three weeks at the insistence of the family. In addition, Ms. Morrison learned the doctors had recommended psychological treatment and avoidance of medical procedures. However, Mrs. Roska had strongly resisted a psychological diagnosis. After Rusty was released from in-patient treatment at UCLA in December, his condition clearly deteriorated in his parents' care.

Although Ms. Morrison was unable to speak immediately with Dr. Gooch, an appointment was made to discuss the case at a later date. The social workers then consulted with counsel who advised them that the circumstances met the statutory requirements for immediate removal. As a result, Rusty's intervention proceeded.

The events in the home during Rusty's removal are decidedly disputed. However, all would agree the scene was chaotic after Mrs. Roska was told that Rusty would be removed. In the midst of the commotion, either Mr. or Mrs. Roska telephoned Dr. Gooch, who called back while the removal was in progress. Eventually, Dr. Gooch spoke with Ms. Sneddon.[10] Dr. Gooch strongly advised

_____

[9](...continued)
clairvoyant.

[10] Prior to the removal, the social workers believed Dr. Evans was the primary treating physician because he was listed on Rusty's school records as his pediatrician. He was also listed as Rusty's pediatrician on the Discharge Plan from UCLA, while Dr. Gooch was listed as a physical medicine specialist. It was

(continued...)

against removal. However, when told of the concerns of Dr. Joseph and Dr. Evans, she refused to confirm or deny any suspicions of MSBP. After Ms. Sneddon consulted with her supervisor, Ms. Lasater, Rusty's removal from the home was completed.

The social workers claim their decision to forego preventive services was reasonable under the circumstances of this case due to a confluence of several factors. First, they reasonably believed the family's history indicated voluntary compliance with preventive measures would not be forthcoming. The Majority rejects this argument for two reasons—DCFS services had not been offered in the past and the failure to comply with the UCLA treatment plan was not indicative of non-compliance with DCFS. Both reasons are unpersuasive. Although DCFS had not offered preventive services in the past, they had conducted an investigation into a report of MSBP. The Roskas had not been cooperative.[11] In Morrison's case notes she also reiterates entries by the Davis County Health workers in 1998

_____

[10](...continued)
only during Ms. Morrison's interview with Mrs. Roska at the home just prior to the telephone call from Dr. Gooch that Mrs. Roska told Ms. Morrison that Rusty's primary physicians were Dr. Gooch and Dr. Seigler. Mrs. Roska explained Dr. Evans was listed as the primary doctor, "but he just refers them out, because [Rusty's] medical condition is 'beyond him.'" (App. Vol. II at 608.)

[11] Although the Majority discounts this fact, finding the evidence "shaky," it is not contested. Moreover, I fail to understand why the Majority does not find it surprising that a parent under DCFS investigation would not be cooperative. Maj. Op. at 16-17 n.6.

-10-

that stated Mrs. Roska was reluctant to allow them visitation and had complained "there were too many people coming in and passing judgment without knowing what was going on." (App. Vol. II at 606.) In addition, Morrison's notes reflect Mrs. Roska told the nurse that "'they' wanted to put [Rusty] in a psychiatric facility but [Mrs. Roska] is totally opposed to that." (*Id.*) Mrs. Roska's resistance to psychiatric treatment for Rusty was also documented in other instances.

Further, I question the Majority's insistence that prior failures to follow through were not relevant to a reasonable assessment of likely future behavior. Especially puzzling is the Majority's speculation that the dire consequences of failing to comply with DCFS services would somehow motivate the family to accept and comply with preventive services before removal was necessary. The same consequences (possible removal and permanent loss of custody) existed when they failed to cooperate with the earlier investigation. More importantly, it is difficult to imagine a parental motivation more compelling then complying with a treatment plan that results in the child's ability to walk, eat and otherwise have a normal life. Thus, the failure to comply with the UCLA plan, the only plan that had to that time resulted in improvement during the time Rusty was an in-patient, would surely be predictive of whether the Roskas would accept or comply with DCFS preventive measures. Dr. Gooch's statement that Mrs. Roska "was doing a

better job of keeping her appointments" does not undermine the reasonableness of the belief that Rusty's parents would not accept or comply with services.[12]

The Majority's holding, however, relies almost exclusively on the fact that Dr. Gooch told Ms. Sneddon, *after* Mrs. Roska was told they were removing Rusty, that removal would destroy "all the progress [Mother] is making as far as making it to appointments etc. She also stated that we are destroying this family emotionally and Rusty may not recover."[13] (App. Vol. III at 718; Vol. II at 611.) The Majority concludes this opinion made it "unreasonable for [the social workers] not to inquire further . . . while they had Dr. Gooch on the telephone." Maj. Op. at 16-17 n.6. We must remember, the social workers were aware that when MSBP is present, the perpetrator's objective is to retain a doctor that will buy-in to the facade. Thus, the failure to be assured of Rusty's safety due to a single physician's opinion contradicting the substantial concerns of three other physicians, particularly when the long dissenter refuses to comment on the

---

[12] While Ms. Morrison was interviewing Rusty's sister, Maria (soon to graduate from high school), prior to telling Mrs. Roska Rusty would be removed, she offered Maria a support person. Maria declined. At the same time, Ms. Sneddon interviewed Rusty and offered him a support person. He also declined.

[13] This quote comes from the notes of Ms. Sneddon. When asked about the conversation, Dr. Gooch testified she stated, "it would be harmful, it would be bad for them, it would be bad for Rusty, bad for his family to remove him from the home." (App. Vol. III at 686.)

likelihood of MSBP, is not unreasonable.[14] *See* Lynne Holland Goldman &

Beatrice Crofts Yorker, *supra,* at 29 ("[P]erpetrators not only deceive the medical

community by fabricating the illness, but these perpetrators are very manipulative

and convincing."). This is not a case where the social workers relied on third-

hand reports from neighbors. Dr. Evans was named as Rusty's primary physician

on school documents and the UCLA Discharge Plan and had recently seen Rusty.

He expressed substantial concern. Dr. Joseph had significant contact with the

family only six months earlier. Dr. Bursch is a known authority on MSBP and

had also had substantial contact with the family. As Dr. Bursch stated in her

report, "At the time of the DCFS removal the overall backdrop of information

represented a compelling picture of possible [MSBP] or related form of medical

abuse." (App. Vol. II at 430.) "It is completely illogical to [] rely solely on the

doctors suspected of being fooled [*i.e.*, Dr. Gooch] to give advice about medical

status or safety." (*Id.* at 433.) Further, the very people we rely on to assist in the

---

[14] The Majority overstates the consequence of this observation. This is not to say that Dr. Gooch was, in fact, being manipulated by Mrs. Roska and had "bought into" the suspected abuse because she disagreed with removal. Maj. Op. at 21-. Neither does this comment allow social work professionals to "ignore the opinion of any doctor who believes removal may harm the child." *Id* at 22. Rather, the question is whether it was reasonable for the social workers to proceed with removal without discussing preventive services at that point. Given the concerns of at least five medical persons (nurses and doctors) and Dr. Gooch's refusal to confirm or deny MSBP at that time, the social workers' decision to forego an immediate initiation of discussions regarding possible preventive services was reasonable.

identification of our children's needs, school personnel, brought the complaint. In light of all these circumstances, a child protective system is a gossamer fabric if a reasonable decision to forego preventive services is rendered unreasonable at the moment a treating physician objects to removal and equivocally responds to the suspected cause of abuse.

The Majority next rejects the social workers' belief that it would have been difficult to devise appropriate services because the source of Rusty's ailments was unknown. That is so, it says, because the social workers reached that conclusion without talking to Dr. Gooch and because the treatment plan developed for Rusty at the UCLA Pain Clinic had proven effective in the past. As discussed above, the social workers reasonably believed they had talked with Rusty's primary physician. As to the UCLA plan, the Majority places the social workers between the proverbial rock and hard place. First, it determines that the Roska's failure to comply with the UCLA treatment plan is not indicative of their likely failure to comply with DCFS preventive services. Then it suggests DCFS should have applied the treatment plan developed for Rusty at UCLA— the very treatment plan the Roskas failed to comply with in the first place. It ignores the fact that the plan was successful only while Rusty was an in-patient.

The Majority then discounts the social workers' argument that allegations of Rusty's parents contributing to or facilitating his illness made it unlikely that

preventive services would be successful. It does so because suspicion of MSBP could not be substantiated. It concludes DCFS should have made services available and if the Roskas rejected the services or failed to comply, or if DCFS's further supervision revealed additional evidence of MSBP, DCFS could then remove Rusty. But, the prior lack of substantiation does not mean Roskas had been exonerated. As Ms. Morrison explained, "[t]here is a difference between without merit and unsubstantiated. Unsubstantiated means we don't have enough evidence to say that this happened. But it may have happened. We just don't have enough evidence to say it did." (App. Vol. II at 415.) In any event, the unsubstantiated charges have little or nothing to do with the reasonable availability of preventive services except to underscore the difficulty of devising services for an unknown causation. In addition, the statute requires the "worker [to] determine whether there are services reasonably available to the worker which, if provided to the minor's parent or to the minor, would *eliminate* the need to remove the minor from the custody of his parent . . . ." UTAH CODE ANN. § 62A-4a-202.1(2)(b) (1998) (emphasis added). Application of preventive services to see if they might work is not a statutory duty.

The question here is whether it was reasonable for these social workers, under these conditions, to determine that preventive services sufficient to meet Rusty's "health, safety, and welfare" needs were not reasonably available. Since

-15-

the suspicions of MSBP were well-documented, if they proved to be true, Rusty's health, safety and welfare were undeniably at risk on a daily basis.[15] The Majority asserts that a panel of this Court decided no emergency circumstances existed to justify removal without due process because Rusty's health and safety were not in immediate danger and therefore, this issue has been decided. *Roska I*, 328 F.3d at 1250. Had the issue been decided, there would be no need for this appeal.

The Majority confuses the discussion regarding whether the law was clearly established, *i.e.*, the necessity of "emergency circumstances which pose an immediate threat to the safety of a child," *Roska I*, 328 F.3d at 1245, citing *Hollingsworth v. Hill*, 110 F3d. 733, 739 (10th Cir. 1997), to justify the absence of pre-deprivation procedures, and the question whether the social workers complied with the statute. The statute requires the offer of services if they are reasonably available and will eliminate the need for removal with the paramount consideration being Rusty's health safety and welfare. Putting aside what process was due, our concern here is the reasonableness of the conclusion, made under stressful and uncertain circumstances, that preventive services adequate to eliminate the need for removal were available. Therefore, our determination in

---

[15] The law does not require the social workers' reasonable and well-supported suspicions to be ultimately confirmed. It requires their professional judgments to be *reasonable*.

the context of the Roskas' Fourth Amendment claim is equally relevant. There, we affirmed the district court's conclusion that, "an objective, reasonable state social worker could have reasonably believed, based on the information the DCFS defendants possessed at the time of removal, that there was substantial cause to believe that there was a substantial danger to Rusty's health or safety and that Rusty's health or safety could not be protected without removing him from his parents' custody" and "there was substantial cause to believe that Rusty's presence in his own home was the reason for his particularly troubling and persistent condition of being restrained to a wheelchair and having to be fed through an intravenous tube even though he was not physically handicapped." *Roska, I*, 328 F.3d at 1250 (emphasis omitted).

The Majority ignores the social workers' belief that confronting Mrs. Roska to offer preventive services might put Rusty in greater danger. Dr. Gooch's opinion was rendered only after Mrs. Roska was told Rusty would be removed from the home. Without any prior indication that preventive services may be warranted, even if they had stopped to discuss preventive services, the social workers' continued fear that Rusty would be put in greater danger was patently reasonable. *See* Lynne Holland Goldman & Beatrice Crofts Yorker, *supra,* at 29 ("[MSBP perpetrators] often become more dangerous when confronted with the possibility that they are causing the child's condition of MSBP, and step up their

-17-

fabrications in order to prove the doctors wrong."); Melissa A. Prentice, *Prosecuting Mothers Who Maim and Kill: The Profile of Munchausen Syndrome By Proxy Litigation in the Late 1990s*, 28 AM. J. CRIM. L. 373, 395 (Summer 2001) ("A mother is likely, when confronted, to escalate the child's symptoms to reinforce to doctors the seriousness of the child's illness . . . .") (quotations omitted); E. Selene Steelman, *supra*, at 272 (evidence of MSBP must be "assessed with prudence before confronting the mother so as not to provoke a defensive action that may subject the child to further harm . . . ."). Finally, the failure to establish MSBP in the two earlier investigations is not uncommon. "In a 1993 study conducted by Herbert Schreier and Judith Libow (HURTING FOR LOVE: MUNCHAUSEN BY PROXY SYNDROME (New York: Guilford Press)), it took more than six months to diagnose MSBP in 33 percent of the cases; in 19 percent of the cases it took more than a year." Lynne Holland Goldman & Beatrice Crofts Yorker, *supra,* at 29.

The Majority's observation that the timing of the conversation with Dr. Gooch rests squarely on the social workers' shoulders is unwarranted. As far as they knew, they had contacted Rusty's primary physician, Dr. Evans, and he had expressed significant concern about Rusty. While the social workers knew Dr. Gooch was part of Rusty's team, there is nothing in the record to indicate they should have known she was the primary physician. The note Morrison found in

Rusty's school records stating, "always talk with Dr. Gooch . . . before taking mother's word for anything" does not compel a different conclusion. Indeed, it seems to reinforce the suspicion that Mrs. Roska was not accurately reporting her son's condition. The Majority also indicates that Morrison spoke to Dr. Gooch prior to the removal and should have indicated at that time that there was an emergency or that removal of Rusty was under consideration. However, whether Morrison actually spoke to Dr. Gooch prior to removal is not apparent from the record. It appears the initial return call from Dr. Gooch was a message requesting Morrison make an appointment. Morrison then complied and received an appointment a week and a half later.[16]

Finally, the juvenile court's ruling at the shelter hearing included a specific finding that, "[d]ue to the emergency situation which exists, the lack of preventive efforts by DCFS is reasonable." (App. Vol. II at 615.) The Majority declines to consider the juvenile court shelter hearing in its reasonableness analysis for two reasons. First, the juvenile court relied on Utah Code Ann. § 78-3a-306(14), which allows a judge to order continued removal of a child regardless

---

[16] Morrison stated in her deposition, "I was still kicking around the fact that I had not talked to Dr. Gooch. I couldn't get hold of her. I actually called her office and she told me curtly that she did not have the time to talk to me at the moment, that it was a complicated case, and that I needed to make an appointment to see her." (App. Vol. II at 414-15.) However, it appears that this reference was to the message she received in response to her call since there is no other discussion of an in-person telephone call with Dr. Gooch prior to removal.

-19-

of any error in the initial removal. This is true. However, the Majority's second contention—the juvenile court did not consider the letter containing Dr. Gooch's opinion that removal could harm Rusty because it was not a sworn statement—is not accurate.

The juvenile court judge read the letter from Dr. Gooch prior to hearing any testimony. Her opinion was referenced twice during Morrison's cross-examination. Defense counsel also referred to Dr. Gooch's opinion in both opening and closing arguments.[17] The record does not indicate that the judge discounted her letter, but nevertheless left Rusty in DCFS custody. In its Order continuing DCFS' custody of Rusty, its specifically noted that "[t]he parties stipulated to the presentation of evidence and testimony by proffer, and the court heard the proffers and arguments of the parties." (*Id*. at 613.) With essentially the same information as that available to the social workers and with the luxury of

---

[17] The Majority chastises Ms. Morrison for not mentioning at the original shelter hearing that they received the telephone call from Dr. Gooch during the removal process. However, Ms. Morrison was not asked about the telephone call during either direct or cross examination. The inquiry from the plaintiff's attorney, the defense attorney and the guardian ad litem was limited solely to her own conversations and did not mention Dr. Gooch's opinion or her reaction to it. The only questions regarding Dr. Gooch was posed by defense counsel when he asked "Dr. Gooch doesn't believe he'll die if he's in the home, does she?" and when answered in the negative, his follow-up question, "Whose more qualified to make that decision, Dr. Gooch or the school nurse . . . ?" (App. Vol. II at 254.) If any person were responsible for "gamesmanship" at the hearing, it was not the social workers.

an opportunity for cool and dispassionate reflection, the judge reached the same decision as did the social workers. That is an exacting measurement when the yard stick is reasonableness. The next day, defense counsel resubmitted the information contained in the letter in the form of an affidavit and added an allegation of emotional "irreparable harm" in support of his motion for a Temporary Restraining Order.

At the second hearing, defense counsel stated, "We've heard from Dr. Gooch twice now, we have a letter, we have her affidavit." (*Id*. at 545.) He then pointed out that this was the only sworn testimony by any treating medical professional. After hearing argument, the juvenile court stated, "[T]he first exhibit we looked at, as you recall, was the doctor's letter, it's not a sworn statement, it's not an affidavit under oath, it's a letter. This is an affidavit under oath. This is legally a little different."[18] (*Id*. at 552.) Thus, the court had substantially the same information at both hearings, but in a different legal context.

In addition, the juvenile court's decision to return Rusty to his home was less than an about-face based on additional information. After noting the legal significance of the affidavit, it proceeded to discuss the evidence and its concerns

---

[18] Unfortunately, the record does not include Dr. Gooch's letter or her affidavit presented to the state court at the two hearings. Like the Majority, I can only surmise the contents from the arguments of counsel.

-21-

regarding the competing risks of returning the child to his home and continuing the removal. Speaking specifically to both the parents and counsel, the juvenile court concluded:

> So, now I'm balancing this risk even though I've stated in conclusory and in general terms and I wish there had been more specificity to whatever [irreparable] harm you're talking about . . . . And that is missing. So, what I'm going to do is this. I'm going to send the child home on a temporary restraining order. Set a hearing . . . and I ask the State to subpoena the doctor into court and she better appear or there will be a sheriff looking for her. . . . [T]here will be a caseworker assigned. I want close supervision. . . . The Guardian Ad Litem is to have direct access to the child and if there are any concerns at all that are raised, the protective supervision worker has the authority under protective supervision to remove the child immediately if there is a physical problem and . . . that's in the good decision and discretion of the caseworker . . . they can . . . remove the child if there is any kind of problem at all. So this is very tenuous stuff here.

(*Id*. at 556-57.)

While the court's ruling at the shelter hearing is not dispositive as it was based on a separate statute, it is a highly persuasive conclusion from one who had the opportunity to see and hear the witnesses. The relevance of its determination at the shelter hearing is not obviated by its ruling the next day.

There is no doubt that the competing interests in a case such as this are most sensitive.

> "[P]rotective services caseworkers [must] choose between difficult alternatives . . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the

-22-

function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999) (quoting *van Emrik v. Chemung County Dep't of Soc. Svcs.,* 911 F.2d 863, 866 (2d Cir. 1990) (footnote omitted)).  *See also Defore v. Premore*, 86 F.3d 48, 50 (2d Cir. 1996) (emphasizing the importance of the qualified immunity defense to ensure publicly employed caseworkers the necessary latitude to exercise their professional judgment in matters related to child welfare).  However, "we must keep in mind that qualified immunity protects all but the *plainly incompetent* or those who knowingly violate the law."  *Roska I*, 328 F.3d at 1251 (citing, *Malley v. Briggs,* 475 U.S. 335 (1986)).  *See Phillips*, 422 F.3d at 1080.  "Where [social workers] of reasonable competence could disagree on the issue, immunity should be recognized."  *Malley*, 475 U.S. at 341.  We should continue to recognize such protection essential if social workers are to adequately protect at risk children.

The totality of the circumstances leaves no doubt that reasonably competent social workers could disagree as to an appropriate response.  Of particular moment were the urgent concerns of school personnel, nurses, health professionals, and doctors regarding Rusty's deteriorating condition and suspected MSBP or medical neglect.  Those concerns were coupled with the compelling medical and factual history supporting suspicions of MSBP and the

family's history of noncompliance with medical treatment plans. On such facts responsible decision makers could, consistent with § 62A-4a-202.1(2)(b), reasonably conclude that available preventive services were inadequate to protect Rusty from a toxic environment suspected of contributing to his seriously deteriorating condition. I would find qualified immunity applies to the facts of this case and therefore respectfully dissent from that part of the Majority opinion.